IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
RICHARD O. FULP, JR.,           )
                                )
            Plaintiff,          )
                                )
      v.                        )     1:21CV310
                                )
KILOLO KIJAKAZI,                )
Acting Commissioner of Social   )
Security,                       )
                                )
            Defendant.¹         )
```

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Richard O. Fulp, Jr., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 13; see also Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI (Tr. 282-89), alleging a disability onset date of October 1, 2009 (see Tr. 282).[2] Upon denial of that application initially (Tr. 139-55, 175-78) and on reconsideration (Tr. 156-74, 182-86), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 187-89). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 67-109.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 8-23.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 278-81, 407-11), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] has not engaged in substantial gainful activity since April 25, 2018, the application date.

2. [Plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine, right shoulder impingement, obesity, bipolar disorder, generalized anxiety disorder and cannabis use disorder.

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

---

[2] Plaintiff subsequently amended his alleged onset date to April 25, 2018 (see Tr. 320), the protective filing date of his SSI claim (see Tr. 282).

> 4. [Plaintiff] has the residual functional capacity to perform light work . . . except he can occasionally stoop, climb stairs, crouch, crawl or kneel. [Plaintiff] can occasionally raise his right arm to shoulder level or above. He can understand, remember and carryout simple and detailed tasks with a majority of the work should be simple tasks. He should have few, if any, changes in routine. [Plaintiff] can occasionally interact with coworkers and supervisors on a basic level but should not work with the public. He should not work in tandem with other individuals or in a crowded workstation. [Plaintiff] should avoid jobs with a fast, production rate pace.
>
> . . .
>
> 5. [Plaintiff] has no past relevant work.
>
> . . .
>
> 9. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.
>
> . . .
>
> 10. [Plaintiff] has not been under a disability, as defined in the . . . Act, since April 25, 2018, the date the application was filed.

(Tr. 14-22 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).

3

Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence

4

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's

---

[3] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

5

age, education, and work experience in addition to [the claimant's] medical condition."  Id.  "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled."  Id.

This sequential evaluation process ("SEP") has up to five steps:  "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work."  Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.'  If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied."  Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled."  Mastro,

---

[4] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ."  Hunter, 993 F.2d at 35 (internal citations omitted).

270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')."  Id. at 179.[5]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled.  See id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[6]

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

[6] A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in
(continued...)

## B. Assignment of Error

Plaintiff's sole issue on review argues that "[t]he ALJ's failure to conduct a proper function-by-function analysis of [Plaintiff]'s mental impairments and failure to provide a logical bridge between the evidence in the record, [the ALJ's] conclusions and her RFC findings is error that prevents substantial evidence from supporting the ALJ's decision." (Docket Entry 12 at 5 (bold font and single-spacing omitted).)[7] In particular, Plaintiff faults the ALJ's evaluation of Plaintiff's subjective reports of mental symptoms on four bases: 1) "the ALJ appear[ed] to rely on a lack of objective medical evidence . . . contrary to the guidance provided in [Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *5 (Oct. 25, 2017) ('SSR 16-3p')]" (Docket Entry 12 at 7 (citing Tr. 18)), 2) the ALJ noted "that [Plaintiff]'s 'impairments seemed to improve with an occasional flare of symptoms'" (id. at 9 (quoting Tr. 20 (internal quotation marks omitted))), but "fail[ed] to

---

[6] (...continued)
the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

[7] Although the heading for Plaintiff's sole issue on review nominally contends that the ALJ "fail[ed] to conduct a proper function-by-function analysis of [Plaintiff]'s mental impairments" (Docket Entry 12 at 5 (bold font and single-spacing omitted)), his argument that follows focuses on various challenges to the ALJ's evaluation of Plaintiff's subjective symptom reporting and the ALJ's characterization of the evidence (see id. at 7-13).

delineate the frequency, duration and impact of the symptoms [Plaintiff] would experience during these 'flares' and then properly account for th[at] finding in the RFC" (id. at 10), 3) the ALJ improperly found "that [Plaintiff]'s 'voluminous record' primarily consisted of prescription refill requests and medication management records" (id. (quoting Tr. 20)), as well as described Plaintiff's bipolar disorder "as in remission" and his anxiety as "stable for the most part" (id. (citing Tr. 20)), and 4) "the ALJ fail[ed] to note the qualifying statements and evidence made by [Plaintiff] with regards to his ability to go out in a public setting" contrary to Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (id. at 10). Those contentions lack merit and thus Plaintiff has not shown any prejudicial error in the ALJ's review of Plaintiff's mental conditions or any breakdown in the ALJ's analytical path from the record evidence to the RFC.

1. <u>Over-Reliance on Objective Medical Evidence</u>

Plaintiff first contests the ALJ's statement "that the 'medical evidence does not support' [Plaintiff]'s 'statements about the intensity, persistence and limiting effects of his symptoms'" (id. at 7 (quoting Tr. 18)) as "contrary to the guidance provided in SSR 16-3p[, which] clearly indicates that objective evidence of alleged symptoms and limitations is not required once an underlying [medically determinable impairment] that could reasonably be expected to produce those symptoms is established" (id. at 8

9

(quoting SSR 16-3p, 2017 WL 5180304, at *5 (SSA "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled"))). In Plaintiff's view, "[g]iven the ALJ's Step 2 findings that [Plaintiff] did have severe mental impairments, i.e. anxiety and bipolar disorder, that could reasonably be expected to cause his alleged symptoms[,] the ALJ erred by concluding that [Plaintiff]'s allegations regarding the impact of th[o]se symptoms on his functioning was [sic] inconsistent because the 'medical evidence' did not support them." (Id.)

Plaintiff's argument regarding SSR 16-3p fails, because that Ruling does not prohibit an ALJ from relying on objective evidence as one part of the analysis of a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms. The Ruling states as follows regarding the role of objective medical evidence in evaluating the intensity, persistence, and limiting effects of symptoms:

> Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities . . . . [An ALJ] must consider whether a[ claimant]'s statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.

10

> *The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence.* Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. . . . .
>
> [An ALJ] will not disregard a[ claimant]'s statements about the intensity, persistence, and limiting effects of symptoms *solely* because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the [claimant]. A report of minimal or negative findings or inconsistencies in the objective medical evidence is *one of the many factors* [an ALJ] *must* consider in evaluating the intensity, persistence, and limiting effects of a[ claimant]'s symptoms.

SSR 16-3p, 2017 WL 5180304, at *5 (emphasis added) (footnote omitted).

Here, in compliance with SSR 16-3p, the ALJ relied on objective medical evidence as just *one part* of her analysis of Plaintiff's subjective symptom reporting. (See Tr. 17-21.) The ALJ also considered the extent of Plaintiff's mental health treatment (see Tr. 18-20), his largely favorable response to that treatment (see id.), his ability to engage in daily activities (see Tr. 16, 19-20), and the opinion evidence (see Tr. 20-21). Plaintiff simply has not shown that the ALJ violated SSR 16-3p.

2. <u>Failure to Define Occasional Flares in Symptoms</u>

Next, Plaintiff faults the ALJ for noting "that [Plaintiff]'s 'impairments seemed to improve with an occasional flare of symptoms'" (Docket Entry 12 at 9 (quoting Tr. 20 (internal quotation marks omitted))), but "fail[ing] to delineate the frequency, duration and impact of the symptoms [Plaintiff] would

11

experience during these 'flares' and then properly account for th[at] finding in the RFC" (id. at 10). According to Plaintiff, "[g]iven that the term 'occasionally' is generally defined by SSA as meaning 'occurring from very little up to one-third of the time'" (id. at 9-10 (quoting Social Security Ruling 83-10, <u>Titles II and XVI: Determining Capability To Do Other Work – The Medical Vocational Rules of Appendix 2</u>, 1983 WL 31251, at *5 (1983) ("SSR 83-10"))), "the ALJ's failure to delineate the frequency, duration and impact of the symptoms [Plaintiff] would experience during these 'flares' . . . is error that prevents the ALJ's decision from being supported by substantial evidence" (id. at 10). Plaintiff deems the ALJ's error in that regard "harmful" (id. at 13) because, in light of the VE's testimony that "respond[ing] to supervisors in an inappropriate manner due to mood swings and anger outbursts 2-3 times a month" (id. at 12-13 (citing Tr. 107-08)), "absenteeism greater than one day a month[,] or off task behavior in excess of 10% would terminate all employment" (id. at 13 (citing Tr. 106)), "the ALJ['s] indicat[ion] that [Plaintiff] would experience flares in his mental health symptoms on an occasional basis - or up to one-third of the time[ - would] suggest[] that [Plaintiff] could reasonably be expected to respond inappropriately, be absent or be off task up to one-third of the time – all conclusion [sic] that would preclude competitive work activity" (id. (internal parenthetical citation omitted) (citing Tr. 20)).

12

As an initial matter, Plaintiff provides no support for the proposition that the SSA's regulatory definition of "occasional" for specific purposes should govern the ALJ's use of the word "occasional" to describe the frequency of Plaintiff's mental health flares in the <u>narrative discussion</u> of the ALJ's decision (<u>see</u> Tr. 20). (<u>See</u> Docket Entry 12 at 9-10.) Nor does the context of the ALJ's use of the term suggest in any way that the ALJ intended "occasional 'flare[s]' of symptoms" (Tr. 20) to mean occurring up to one-third of the time:

> Although the record was voluminous, it appeared the majority of the file was prescription refill requests and medication management. [Plaintiff]'s impairments seemed to improve with an <u>occasional</u> "flare" of symptoms. [Plaintiff]'s bipolar was in remission and his anxiety was stable for the most part.

(Tr. 20 (emphasis added).) The full context thus strongly suggests that the ALJ intended the word "occasional" to have its ordinary meaning in common parlance, i.e., that Plaintiff's mental symptoms remained largely controlled by medication and therapy with flares in his symptoms occurring "at irregular or infrequent intervals," "Definition of *occasional*," https://www.merriam-webster.com/dictionary/occasional (last visited Aug. 31, 2022). <u>See</u> <u>Dale D. v. Commissioner of Soc. Sec.</u>, Civ. No. C19-5290, 2019 WL 5310295, at *2 (W.D. Wash. Oct. 21, 2019) (unpublished) ("Social Security regulations do not eliminate the ordinary usage of common English words. SSR 83-10 defines 'occasionally' with regard to the frequency of tasks or environmental conditions in a job. Nothing

13

in [the physician]'s opinions suggests that she was referring to SSR 83-10 or any other regulation in opining occasional lapses in concentration." (internal citation omitted)). Moreover, although Plaintiff maintains that the ALJ's acknowledgment of occasional symptom flares required her to "account for [the flares] in the RFC" (Docket Entry 12 at 10), Plaintiff has not shown that the ALJ's existing RFC limitations to "a majority of the work [as] simple tasks," "few, if any, changes in routine," "occasional[] interact[ion] with coworkers and supervisors on a basic level but [no] work with the public," "no[] work in tandem with other individuals or in a crowded workstation," and no "jobs with a fast, production rate pace" (Tr. 17) fail to sufficiently account for Plaintiff's occasional symptom flares.

3. <u>Mischaracterization of the Record</u>

Plaintiff additionally contests the ALJ's finding "that [Plaintiff]'s 'voluminous record' primarily consisted of prescription refill requests and medication management records" (Docket Entry 12 at 8-9 (quoting Tr. 20)), noting that the "record, while voluminous, reveals ongoing mental health treatment that consisted of therapy with a counselor as well as treatment by a specialist physician," and that, "[w]hile there were a few gaps in the treatment records[,]" (<u>id.</u> at 9), "[t]he record indicates (almost monthly) consistent attendance with mental health occurring from late 2018-early 2020" (<u>id.</u> at 9 n.3 (citing Tr. 721, 731, 873,

14

875, 903, 934, 953, 1050, 1084, 1105, 1142, 1156, 1443, 1890, 2141)). Plaintiff further objects to the ALJ's description of Plaintiff's bipolar disorder "as in remission" and his anxiety as "stable for the most part" (id. (citing Tr. 20)), arguing that "[t]reatment records actually indicate that [Plaintiff]'s bipolar disorder was in partial remission at times - not in remission as the ALJ suggest[ed]" (id. at 9 n.2 (citing Tr. 427, 903, 954, 1050, 1105, 1158, 1445, 1893)).

Despite Plaintiff's protestations, the ALJ did not err by observing that the "voluminous" record contained mainly "prescription refill requests and medication management" (Tr. 20). The record in this case contains over 1800 pages of medical records; yet, those pages contain only eight visits with Dr. Carter (see Tr. 720-21, 731-32, 913-14, 934-35, 1084-85, 1142-43, 1457-58, 2141-42) and just eight visits with Plaintiff's treating therapist Joy F. Marcum (see Tr. 837, 903, 953-54, 1048-50, 1105-07, 1156-57, 1443-44, 1890-92) during the two-year relevant period. Although some of the remaining pages involve Plaintiff's treatment for physical conditions, a very large portion of the remainder involves "prescription refill requests and medication management" (Tr. 20). Moreover, despite Plaintiff's claim of "consistent attendance" at mental health appointments (Docket Entry 12 at 9 n.3), the ALJ correctly noted that "[a] December 2018 therapy note indicated [Plaintiff] had missed 7 appointments recently" (Tr. 19 (citing Tr.

15

903); see also Tr. 836 (notice that Plaintiff cancelled 10/3/18 appointment with Therapist Marcum), 884-85 (11/28/18 letter from Dr. Carter to Plaintiff serving as "final attendance warning" for missed and late-cancelled appointments), 1045 (notice that Plaintiff cancelled 3/29/19 appointment with Therapist Marcum), 1050 (Therapist Marcum's observation that, because Plaintiff had only attended five therapy sessions in previous year, his opportunity to work on his treatment plan "was limited"), 1888 (notice that Plaintiff cancelled 12/18/19 appointment with Therapist Marcum)).

Regarding Plaintiff's bipolar disorder, the ALJ did overstate Plaintiff's response to treatment (at one point) by describing the condition as "in remission" (Tr. 20). As Plaintiff points out, his treatment providers believed that Plaintiff's bipolar disorder reached, at most, "partial remission." (Docket Entry 12 at 9 n.2 (citing Tr. 427, 903, 954, 1050, 1105, 1158, 1445, 1893).) That error by the ALJ, however, remains harmless, see generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"), as the ALJ's narrative discussion of the evidence elsewhere accurately describes Plaintiff's bipolar disorder as "in partial remission" (Tr. 19 (emphasis added)) and Plaintiff has not provided any reason

16

to believe that the result would change on remand to harmonize those two descriptions (see Docket Entry 12 at 9-10).

4. <u>Failure to Consider Qualifying Statements About Activities</u>

Lastly, Plaintiff asserts that "the ALJ fail[ed] to note the qualifying statements and evidence made by [Plaintiff] with regards to his ability to go out in a public setting," contrary to <u>Woods</u>. (Docket Entry 12 at 10.) In that regard, Plaintiff notes that <u>Woods</u> held that "'an ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them.'" (<u>Id.</u> (quoting <u>Woods</u>, 888 F.3d at 694) (italics added to match original).) In Plaintiff's view, the ALJ "fail[ed] to note that [Plaintiff's] going out in a public setting was actually a goal established as part of his ongoing therapy and treatment" (<u>id.</u> (citing Tr. 86, 1050)), that he "le[ft] his therapist's office and attend[ed] his trips in a public setting on the same day" (<u>id.</u> (citing Tr. 92)), that Plaintiff "chose places like Home Depot to visit because it [wa]s 'nice and spacy'" (<u>id.</u> (quoting Tr. 86)), that "his girlfriend attended appointments with him" (<u>id.</u>), that "he utilized Thorazine daily with additional doses necessary on an as-needed basis" (<u>id.</u> (citing Tr. 873, 1050, 1105)), and that "he reported symptoms of nausea, vomiting, diarrhea and/or sweating that occurred with knowledge he would need to leave his home (even for doctor appointments)" (<u>id.</u> (citing Tr. 94-96, 333, 336, 347, 351, 361)).

17

Plaintiff's contentions in that regard miss the mark, as well-explained by the Commissioner:

> Plaintiff also argues that the ALJ should not have used evidence of Plaintiff's ability to go out in public to discount his subjective complaints because he went out in order to satisfy his treatment goals ([Docket Entry 12 at 10]). He does not explain, however, why [his] motivation makes a difference; the fact remains, as the ALJ noted, that Plaintiff did go to restaurants, shop in stores, go on vacation, and attend family gatherings during the relevant period (Tr. 18-20; see also Tr. 837, 903, 953, 1009, 1050, 1095, 1106, 1156, 1186, 1443, 1891). And, contrary to Plaintiff's argument, the ALJ did acknowledge Plaintiff's difficulties in doing so – [the ALJ] recounted [Plaintiff's] testimony that he sometimes vomited due to anxiety when he had to leave home (Tr. 17); [the ALJ] noted that Plaintiff needed extra medication to manage certain public activities, such as attending a gun show (Tr. 19); and [the ALJ] discussed Plaintiff's inability to go to casinos due to crowds while on vacation (Tr. 19). Based on these activities, the qualifications thereto, and an assessment of the medical record as a whole, the ALJ included a host of restrictions in the RFC geared toward Plaintiff's social difficulties . . . .

(Docket Entry 14 at 12.)

In light of the foregoing analysis, Plaintiff has failed to show any material defect in the ALJ's analysis of Plaintiff's mental impairments or any flaw in the logical bridge from the record evidence to the ALJ's RFC and thus Plaintiff's first and only assignment of error falls short.

### III. CONCLUSION

Plaintiff has not established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

18

Summary Judgment (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.

                                                     /s/ L. Patrick Auld
                                                      **L. Patrick Auld**
                                       **United States Magistrate Judge**

September 1, 2022